IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 22, 2025

**STATE OF TENNESSEE v. GARY DYQUANNE CROSS**

**Appeal from the Criminal Court for Hamilton County**
**No. 309527   Barry A. Steelman, Judge**

_____

**No. E2024-00967-CCA-R3-CD**

_____

The defendant, Gary Dyquanne Cross, was convicted by a Hamilton County Criminal Court jury of facilitation of first-degree murder and sentenced to twenty-five years in the Department of Correction.  On appeal, the defendant argues that: (1) the evidence is insufficient to sustain his conviction; (2) cellphone record evidence that was presented to the jury was unreliable; (3) the trial court erred in allowing prejudicial photographs into evidence; (4) the trial court erred in not allowing the jury to "rehear" the testimony of a State's witness during its deliberations; (5) the trial court erred in not declaring a mistrial after an individual communicated to a member of the jury; and (6) the cumulative effect of the errors warranted a new trial.  After reviewing the record and considering the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and ROBERT W. WEDEMEYER, J., joined.

William M. Speek and Jonathan T. Turner (on appeal), and Melody Shekari and Andrea Hayduk (at trial), Chattanooga, Tennessee, for the appellant, Gary Dyquanne Cross.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; Coty Wamp, District Attorney General; Cameron Williams, Executive District Attorney General; and Austin Scofield and Brian Finlay, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

***Facts and Procedural History***

The defendant and three co-defendants, Prandel Fitzgerald Reid, Jr., Jamichael Antron Smith, and Antonio Dewayne Watkins, were indicted for premeditated first-degree murder arising out of a drive-by shooting the afternoon of July 21, 2019, that resulted in the death of Tracy Calloway. The State severed the co-defendants and proceeded to trial against the defendant.

The morning of July 21, 2019, Kentarius Nealy and Jamichael Smith went to the defendant's house to smoke synthetic marijuana, also known as K2 or "spice." Mr. Nealy and Mr. Smith "chilled and smoked for a minute." Shortly after, Antonio Watkins arrived at the defendant's house, and the entire group left to go to Prandel Reid's home. The defendant drove Mr. Nealy, Mr. Smith, and Mr. Watkins in his minivan. A row of seats had been removed from the back of the van and there were guns laying in it. When they arrived at Mr. Reid's home, Mr. Reid got into the van with the others, and the defendant drove to Mr. Nealy's grandmother's house for Mr. Nealy to pick up his girlfriend's silver Kia Forte. The group traveled to a nearby Speedway gas station with Mr. Nealy driving the Kia and Mr. Smith, Mr. Reid, and Mr. Watkins riding with the defendant in the van.

After stopping at the gas station, the group "went riding through Brainerd," still with Mr. Nealy in the Kia and Mr. Smith, Mr. Reid, and Mr. Watkins with the defendant in the van. Mr. Smith called Mr. Nealy saying they were driving to Highway 58, and Mr. Nealy said he would follow them. According to Mr. Nealy, they were just "chilling" and "joyriding" around town smoking "spice." Mr. Nealy followed the defendant to a neighborhood near Trailwood Drive when the defendant abruptly stopped his van, causing Mr. Nealy to almost rear-end him. Mr. Nealy saw Mr. Smith and Mr. Reid jump out of the defendant's van and start shooting. Mr. Nealy "swerved" around the defendant's van and kept going.

Mr. Nealy drove around the corner and stopped to check his car to make sure it had not been hit. While Mr. Nealy was stopped, the defendant drove up and Mr. Smith and Mr. Reid got into Mr. Nealy's car. Mr. Nealy did not want the men in his vehicle but was unwilling to say no to them. Mr. Nealy drove Mr. Smith and Mr. Reid to East Chattanooga and dropped them off, but while en route, Mr. Smith and Mr. Reid told Mr. Nealy that they had shot Mr. Calloway.

Later that night, the police arrived at Mr. Nealy's girlfriend's house where Mr. Nealy was staying and took him into custody. During his interview, Mr. Nealy initially lied to the officers. He was concerned about his federal probation and the possibility of new charges. However, after he was confronted with evidence of his car on video footage and offered immunity, Mr. Nealy told the truth.

Mr. Nealy claimed that he was not aware of plans to kill anyone and pointed out that he was not involved in any discussions that took place in the defendant's minivan after he was no longer in the van. Mr. Nealy reiterated that he saw the defendant driving the minivan throughout the entire day, including immediately after the shooting.

Dexter Posey lived on Trailwood Drive at the time of the shooting. Mr. Posey heard what sounded like fireworks and ran to the door. He "saw a gray van and people running back and forth" and realized he was witnessing a drive-by shooting. Mr. Posey took cover until the gunfire subsided and then went outside where he saw a white car "crashed" into a neighbor's house. Inside the car, Mr. Posey discovered the victim, who had been shot multiple times.

Mr. Posey checked his home security camera and finding it had captured the shooting, turned the footage over to the police. The video showed a Chrysler minivan and Kia Forte "traveling in tandem." The "van stopped short and the Kia Forte almost ran into the van[.]" Two gunmen exited from one side of the minivan, one armed with a pistol and the other with a "rifle-style weapon." Further video evidence and evidence at the scene indicated that a third gunman exited the minivan from the other side. The video also showed that the minivan had the faded remnants of a bumper sticker and that a piece of window glass fell from the minivan.

Officer Andrew Irwin and Detective James Goehring with the Chattanooga Police Department ("CPD") were two of the members of law enforcement who responded to the scene of the shooting. The victim's car was "riddled with bullet holes" and crashed in the front yard of a home. Paramedics were attending to the victim inside his vehicle.

Jerry McElroy with the CPD crime scene unit processed the scene of the shooting, which included taking photographs and collecting evidence. Officer McElroy recovered sixty-four shell casings and a number of bullet projectiles from the scene. Officer McElroy noted over thirty bullet holes in the victim's car and recovered bullet fragments from inside the car. Officer McElroy was able to determine that bullets entered the vehicle from all sides. Officer McElroy located a 9mm pistol loaded with three bullets wedged between the driver's seat and center console. No 9mm shell casings were found inside the victim's vehicle or on the scene at Trailwood Drive.

Special Agent Savannah Houk with the Tennessee Bureau of Investigation analyzed the shell casings and bullet fragments recovered from the scene. Agent Houk determined that the shell casings were of two calibers, 7.62 x 39mm and .40, but that two different firearms shot the 7.62 x 39mm rounds. Agent Houk, therefore, determined that three firearms had been used. Agent Houk examined the 9mm pistol recovered from the victim's

car and concluded that it did not fire any of the shell casings or bullet fragments that she received.

CPD Detective Zack Crawford reviewed the video footage from Mr. Posey's home and was aware of the "two suspect vehicles that were used during the incident." Detective Crawford recovered footage from the Realtime Intelligence Center ("RTIC") cameras placed in strategic locations around town that showed a minivan and Kia Forte travelling together about an hour before the drive-by shooting in a neighborhood the victim was known to frequent. The license plate was visible on the Kia, which allowed officers to learn that it was registered to Mr. Nealy's girlfriend and ultimately that Mr. Nealy was using the vehicle that day.

Detective Goehring brought Mr. Nealy in for questioning, which led to a big break in the case. Mr. Nealy initially only gave "half-truths" but, after being confronted with the RTIC video evidence, provided more information. Based on information learned from Mr. Nealy, Detective Goehring obtained video footage from a Speedway gas station on 3rd Street, which was roughly three blocks from the defendant's residence.

Joseph Harvey worked as the general manager of the Speedway gas station and turned over the surveillance footage for July 21, 2019, to the police. The footage showed a Chrysler Voyager minivan parked at a gas pump at 11:42 a.m. and the defendant walking across the parking lot into the store and back. The footage also showed the minivan and a Kia Forte pulling into the parking lot less than an hour later, at 12:29 p.m., and the defendant exiting the driver's seat of the minivan and Mr. Nealy exiting the driver's seat of the Kia. Detective Goehring identified the defendant and Mr. Nealy in the video, explaining that he was familiar with Mr. Nealy and that the defendant had nothing covering his face. Detective Goehring admitted that a person who looked to be Mr. Nealy also appeared in footage from the Speedway at 11:09 a.m. as well.

Detective Goehring acknowledged that he could not identify any of the individuals inside the minivan from the RTIC video footage because the windows were tinted or identify the gunmen on the street from Mr. Posey's camera footage because they were wearing hoods and masks. Detective Goehring was never able to obtain a license plate number for the minivan, and the defendant did not have a minivan registered to him. Officers recovered the minivan two days after the shooting and processed it, but nothing matched the defendant or any of the codefendants.

Detective Goehring obtained the cellphone records for the codefendants and, after cross-checking numbers, discovered that a cellphone number registered to a Gary Cross was in contact with the codefendants on the day of the murder. Therefore, Detective Goehring obtained the cellphone records for the aforementioned Gary Cross, presumably

the defendant. Mark Hamilton, an investigator with the Hamilton County District Attorney's Office and expert in cell network analysis and radiofrequency communications engineering, analyzed the defendant's cellphone records. According to Investigator Hamilton's analysis, the defendant's cellphone was in close proximity to the Speedway gas station at times the defendant was at that location per the surveillance footage. Additionally, the defendant's cellphone was in close proximity to the homicide scene between 2:08 p.m. and 2:18 p.m., the timeframe of the shooting at 2:13 p.m. Investigator Hamilton acknowledged, however, that the cellular and data analysis he conducted did not pinpoint an exact location like GPS.

Medical Examiner Dr. Steven Cogswell conducted the autopsy on the victim. The autopsy revealed that the victim sustained five gunshot wounds – one to his forehead that fractured the skull and "cut apart or chopped apart" the front part of the brain, one to the left shoulder, one to the right upper arm, one to the right side of the chest, and one to the right lower abdomen. Three medium-caliber, i.e., 9mm, .38, or .40, bullets were recovered from the victim's body. Dr. Cogswell concluded that the cause of death was multiple gunshot wounds and manner of death was homicide.

Following the conclusion of the proof, the jury convicted the defendant of the lesser-included offense of facilitation of first-degree murder, and after a sentencing hearing, the trial court imposed a sentence of twenty-five years' confinement. The defendant appealed.

*Analysis*

On appeal, the defendant argues that: (1) the evidence is insufficient to sustain his conviction; (2) cellphone record evidence that was presented to the jury was unreliable; (3) the trial court erred in allowing prejudicial photographs into evidence; (4) the trial court erred in not allowing the jury to "rehear" the testimony of a State's witness during its deliberations; (5) the trial court erred in not declaring a mistrial after an individual communicated to a member of the jury; and (6) the cumulative effect of the errors warranted a new trial.

## I. Sufficiency

The defendant argues that the evidence is insufficient to sustain his conviction because the State did not establish that he acted "knowingly," there was no physical evidence tying him to the murder, and the testimony of Kentarius Nealy as an accomplice

was not sufficiently corroborated.[1]  The State responds that viewing the evidence in the light most favorable to the State, the evidence sufficiently establishes the defendant's guilt of facilitation of first-degree murder.  We agree with the State.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).  All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact.  *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973).  Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation.  The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand.  Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses.  In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (1963)).  "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two.  *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)).  The standard of review for

---

[1] The defendant acknowledges that the Tennessee Supreme Court recently abolished the common law accomplice corroboration rule, but only on a prospective basis to trials commencing after its decision.  *State v. Thomas*, 687 S.W.3d 223, 242-245 (Tenn. 2024).

sufficiency of the evidence "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *See id.* at 379. Circumstantial evidence alone may be sufficient to support a conviction. *State v. Richmond*, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.* This Court will not exchange its "inferences for those drawn by the trier of fact from circumstantial evidence." *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

"A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403. A person

> acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

*Id.* § 39-11-106(a)(23), -302(b). A person who "facilitates" the felonious conduct of another "knowingly furnishes substantial assistance," but "lacks the intent to promote or assist in, or benefit from, the felony's commission." *Id.* § 39-11-403(a), Sentencing Comm'n Cmts. In short, "the State was required to prove the commission of a specified felony and the assistance the [defendant] gave to the person committing the specified felony." *State v. Dych*, 227 S.W.3d 21, 40 (Tenn. Crim. App. 2006).

As charged here, the specific felony at issue is first-degree murder, which is "a premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation is "an act done after the exercise of reflection and judgment." *Id.* § 39-13-202(d). A person "acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id.* § 39-11-302(a).

The identity of the perpetrator "is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)). The perpetrator's identity "may be established solely on the basis of circumstantial

evidence." *State v. Lewter*, 313 S.W.3d 745, 748 (Tenn. 2010). The identification of the defendant as the perpetrator is "a question of fact for the jury upon its consideration of all competent proof." *State v. Bell*, 512 S.W.3d 167, 198 (Tenn. 2015) (citing *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005)).

We begin our review by noting that the defendant does not contest that Mr. Calloway was the victim of an intentional and premeditated murder, but instead, the defendant asserts that there is insufficient proof of his identity as one of the individuals involved and / or that he acted "knowingly." However, viewed in the light most favorable to the State, there was sufficient evidence from which a rational trier of fact could find that the defendant knowingly furnished substantial assistance to the gunmen in the murder of Mr. Calloway. Mr. Nealy testified to the events of the day of the murder, including the defendant's having a row of seats removed and multiple firearms in the back of his minivan, and defendant's driving Mr. Reid, Mr. Smith, and Mr. Watkins around town and to the victim's neighborhood. Mr. Nealy identified the defendant as the driver of the minivan both before the shooting and immediately after. Footage of the shooting showed the minivan come to an abrupt stop, at least two gunmen exit the van and fire repeated shots, the gunmen get back into the waiting minivan, and the van speed away. The defendant's contention that testimony of the minivan coming to an abrupt stop right before the shooting indicated that he acted under surprise or duress rather than "knowingly" was obviously disbelieved by the jury based on proof that the defendant had guns in his vehicle before picking up the other men and drove around with the gunmen for most of the day. The jury also could have surmised that the defendant could have easily driven off while the gunmen were out of the vehicle shooting had he not wanted to be involved. The defendant also contends that there was no physical or DNA evidence tying him to the murder, but such is not required as "[c]ircumstantial evidence alone is sufficient to support a conviction[.]" *State v. Hawkins*, 406 S.W.3d 121, 131 (Tenn. 2013) (citing *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012); *Dorantes*, 331 S.W.3d at 379-81). The evidence is sufficient, and the defendant is not entitled to relief.

Pertinent to our review of the sufficiency of the evidence, the defendant additionally asserts that Mr. Nealy was an accomplice whose testimony was not sufficiently corroborated. We disagree.

At the time of the offense, it was well-established that "evidence is insufficient to sustain a conviction when the conviction is solely based upon the uncorroborated testimony of one or more accomplices." *Thomas*, 687 S.W.3d at 239 (citing *State v. Collier*, 411 S.W.3d 886, 894 (Tenn. 2013) (internal quotation marks omitted)) (abolishing the common law accomplice-corroboration rule on a prospective basis). "An accomplice is one who knowingly, voluntarily, and with common intent participates with the principal offender in the commission of a crime." *State v. Bough*, 152 S.W.3d 453, 464 (Tenn. 2004). The test

for whether a witness qualifies as an accomplice is "whether the alleged accomplice could be indicted for the same offense charged against the defendant." *State v. Allen*, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997).

Contrary to the defendant's assertion, it is simply not clear that Mr. Nealy qualifies as an accomplice. Mr. Nealy was admittedly with the defendant earlier in the day of the shooting, but after the defendant took Mr. Nealy to Mr. Nealy's girlfriend's car, Mr. Nealy was no longer present for any conversations that took place in the defendant's minivan. Also, Mr. Posey's security camera footage showed Mr. Nealy nearly rear-ending the defendant's minivan when it stopped abruptly to allow the gunmen out and Mr. Nealy swerving around and speeding away. This suggests that Mr. Nealy was unfamiliar with the plan. Mr. Nealy testified that he did not learn who had been shot until Mr. Smith and Mr. Reid told him afterwards. Based on this proof, we cannot conclude that Mr. Nealy could have been indicted for the same offense charged against the defendant.

In any event, even if Mr. Nealy was deemed an accomplice, his testimony was sufficiently corroborated. Our supreme court recently described the accomplice-corroboration rule as follows:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.

*Thomas*, 687 S.W.3d at 240 (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994)). The corroborating evidence need only be "slight." *State v. Griffs*, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997). Whether sufficient corroboration exists is for the jury to determine. *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001).

The State presented video footage of the shooting from Mr. Posey's home camera that supported Mr. Nealy's recount of the event, including the minivan stopping abruptly,

gunmen getting out and shooting, and him swerving around the van and driving off. The State also presented footage from an RTIC camera and footage from the Speedway gas station that corroborated Mr. Nealy's testimony that the group went to the gas station and drove around together. Detective Goehring identified the defendant to the jury as the individual in the videos and photographs from the Speedway gas station. The defendant's cellphone records placed him in the proximity of the Speedway gas station at times the video footage showed him there and in proximity of the drive-by shooting in the timeframe it occurred. This evidence fairly and legitimately tended to connect the defendant with the commission of the crime sufficient to corroborate the testimony of Mr. Nealy. The defendant is not entitled to relief.

## II. Cellphone Records

The defendant argues that the cellphone record evidence that was presented to the jury was unreliable.[2] The State responds that the defendant has waived this claim for failing to object at trial or include it in his motion for new trial. We agree with the State.

The defendant claims that the expert testimony of Investigator Mark Hamilton lacked reliability and should not have been presented to the jury. The defendant relies on a 2012 federal district court opinion from Illinois, *United States v. Evans*, 892 F. Supp. 2d 949, 956 (N.D. Ill. 2012), in support of his assertion that the testimony was "patently unreliable." The defendant, however, has waived review of this claim for failing to object to the testimony at trial or include the issue in his motion for new trial. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); Tenn. R. App. P. 3(e) ("Provided, however, that in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.").

However, an appellate court may review an unpreserved error pursuant to the plain error doctrine, if the defendant bears his or her burden to show that all five prerequisites are satisfied:

(1) The record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the accused did not waive the issue for

---

[2] The defendant included this issue as a subpart under his sufficiency argument, but it appears in actuality to be a stand-alone claim and will be treated as such.

tactical reasons; and (5) consideration of the error is necessary to do substantial justice.

*State v. Dotson*, 450 S.W.3d 1, 49 (Tenn. 2014) (quoting *State v. Gomez*, 239 S.W.3d 733, 737 (Tenn. 2007)).  "To rise to the level of plain error, [a]n error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding."  *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016) (alterations in original) (internal quotation marks omitted) (quoting *State v. Banks*, 271 S.W.3d 90, 127 (Tenn. 2008)).  "If a defendant fails to establish any of these criteria, an appellate court must deny relief under the plain error doctrine, and an appellate court need not consider all criteria when the record demonstrates that one of them cannot be established."  *State v. Vance*, 596 S.W.3d 229, 254 (Tenn. 2020).

Here, the defendant has not acknowledged the waiver of his cellphone records claim, requested that this Court undertake plain error review, or engaged in an analysis of the factors that could entitle him to plain error relief.  It is incumbent upon the defendant to establish all the criteria for relief under the plain error doctrine.  *See, e.g.*, *State v. Thompson*, 2023 WL 4552193, at *5 (Tenn. Crim. App. July 14, 2023) ("Because the [d]efendant bears the burden of persuasion to show that he is entitled to plain error relief, a defendant's failure to request this relief weighs against any such consideration on our own.") (citations and internal quotations omitted); *State v. Powell*, 2013 WL 12185202, at *8 (Tenn. Crim. App. Apr. 26, 2013) (declining to exercise discretion to review issue for plain error where "Defendant did not request in his brief on appeal that this issue be reviewed for plain error, . . . nor has Defendant filed a reply brief in which he requests plain error review"), *perm. app. denied* (Tenn. Sept. 11, 2013).

Nonetheless, even if we were to undertake plain error review, at least one of the five requisite factors is missing from this case: There is no breach of a clear and unequivocal rule of law.  First, it is not even evident that Investigator Hamilton used the "granulization theory" at issue in *Evans*.  Second, case law from a district court in Illinois is hardly a "clear and unequivocal rule of law" in Tennessee.  In fact, the one time the aforementioned case appears in our search of opinions from this Court or our supreme court, this Court declined to apply its holding.  *See State v. Brown*, 2019 WL 1514551, at *47 (Tenn. Crim. App. Apr. 8, 2019), *perm. app. denied* (Tenn. Aug. 15, 2019).  The defendant is not entitled to relief.

## III.  Photographs

The defendant argues that the trial court erred in allowing certain crime scene and autopsy photographs into evidence.  The State responds that the trial court properly

exercised its discretion in admitting the photographs as they were relevant to the elements of the crime and not unduly prejudicial. We agree with the State.

The record shows that during the trial, the defendant objected to admission of four[3] photographs of the victim's vehicle taken by the crime scene investigator. The defendant argued that the photographs were "more prejudicial than probative" in that they are "particularly bloody and . . . gruesome." The defendant asserted that the "damage to the vehicle can be shown in several other ways[,]" especially considering there was no evidence the defendant was a shooter who caused the damage to the vehicle. In particular, with regard to a photograph showing a car seat in the victim's car, the defendant asserted that the photograph "humanizes [the victim] in a different way" and was "unnecessary."

The State responded that the photographs of the car were necessary to "show[] the documentation done by the investigators at the Chattanooga Police Department" at a time when "police work is always sort of subject to scrutiny." The State asserted that the photographs also aid in understanding the medical examiner's testimony "with respect to how many shooters there were [and] the angles of the bullets[.]" The State also asserted that the photographs were relevant to prove premeditation and intent by showing the "coordinated efforts . . . by the various defendants," the number and locations of the shell casings, and the amount of damage inflicted upon the victim and his vehicle.

After hearing arguments from the parties, the trial court analyzed each of the contested photos, independently and in light of the uncontested photos. The court acknowledged that the defendant was not alleged to be a shooter but determined that because the defendant could be found guilty under a theory of criminal responsibly, the "distinction in him not being a shooter is [not] such that it would cause extreme prejudice to him by showing the results of the crime that he is alleged to have participated in." Therefore, the court found all four photographs to be relevant and probative. The court acknowledged that the photographs showed blood inside the car but pointed out that they did not show the victim's body inside the car. The court ruled that the probative value was not substantially outweighed by the danger of unfair prejudice and ruled that the selected photographs were admissible.

The defendant also objected to the admission of five autopsy photographs, and the trial court conducted a jury-out hearing. The medical examiner testified that the photographs showed the victim's gunshot wounds and allowed him to describe the caliber of bullets that caused the wounds and fragment injuries on the body. The defendant argued that the photographs did not prove anything more than the testimony itself would and were, therefore, unnecessary and prejudicial. The defendant asserted that the photographs did

---

[3] The defendant initially objected to a fifth photograph but after discussion withdrew the objection.

not "add anything other than extra gruesome or extra violence on top of what [the medical examiner] could simply testify to as far as getting the evidence before them that the State needs to prove their case." The defendant additionally pointed out that the cause of death was not at issue.

The State argued that the photographs were relevant and probative because they corroborated testimony about the number of shooters, relative direction of the rounds, and that the "location of the entrance wounds would be consistent with location of shell casings and other items at the scene." The State also asserted that the photographs illustrated the cause and manner of death.

After hearing arguments from the parties, the trial court analyzed each of the contested photographs. The court determined that exhibits 41 and 42 were inadmissible because they were cumulative and also overly prejudicial in that they showed "much more of the victim's face" or "profile of the victim's face." However, the court determined that exhibits 39, 40, and 43 were admissible. The court found that the admitted photographs were "useful and probative in that they illustrate . . . better [than] a verbal description . . . or even a drawing." Specifically with regard to the photograph depicting the victim's head wound, the court noted that prejudice was lessened because the victim's eyes were covered, and the photograph allowed the medical examiner to illustrate that that wound was caused by a higher caliber weapon than the other wounds. The court concluded that the probative value of the admitted photographs was not substantially outweighed by the danger of unfair prejudice.

The defendant argues that the trial court should have excluded the four crime scene photographs because they contained "excessive blood" and do not show premeditation on the defendant's part. The defendant also argues that the three autopsy photographs were "rather gruesome" and overly prejudicial because the State did not need to show that the victim died from gunshots.

Tennessee Rule of Evidence 401 provides that evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is typically admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. The admissibility of evidence is within the sound discretion of the trial court, and this Court will not interfere with that discretion absent a clear showing of abuse of discretion. *See State v. Clayton*, 535 S.W.3d 829, 859 (Tenn. 2017). This Court finds an abuse of that discretion when the

trial court applies "an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007) (quoting *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006)).

Photographs of victims "are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." *State v. Banks*, 564 S.W.2d 947, 950-51 (Tenn. 1978). In determining the admissibility of such evidence, the trial court should consider

> their accuracy and clarity, and whether they were taken before the corpse was moved, if the position and location of the body when found is material; the inadequacy of testimonial evidence in relating the facts to the jury; and the need for evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.

*Id.* at 951. Unfair prejudice occurs when there is "an undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one." *Dotson*, 450 S.W.3d at 91 (quoting *Banks*, 564 S.W.2d at 950-51).

We determine that the trial court properly exercised its discretion in admitting the four challenged crime scene photographs. The State had to prove that the killing was intentional and premeditated. The crime scene photographs depicted the extensiveness of the attack, which is indicative of an intentional and premeditated killing. *See Banks*, 564 S.W.2d at 950 (a jury may infer that the killing was premeditated and intentional based on the brutality of the attack). The victim's body had been removed from the scene, so the photographs only displayed the blood and glass that one would reasonably expect from a drive-by shooting involving three gunmen and more than sixty bullets. Additionally, the car's dark interior minimized the visual impact of the blood. This Court has reviewed the contested photographs and conclude that they are not so gruesome or grisly as to substantially outweigh the probative value of proving the murder was an intentional and premeditated attack. There was no clear abuse of discretion by the trial court.

We also determine that the trial court properly exercised its discretion in admitting the three challenged autopsy photographs. Again, the photographs showed the brutality of the attack and allowed the medical examiner to illustrate the extent of the victim's injuries and the different caliber weapons that caused the various injuries. Our supreme court has recognized that post-mortem photographs may be relevant to show how the victim died, as well as go to the issues of premeditation and intent. *See State v. Davidson*, 509 S.W.3d 156, 199 (Tenn. 2016). The admitted photographs were close-up views of the victim's gunshot wounds after he had been cleaned, and the trial court diligently excluded the photographs that could be considered more visually disturbing. Therefore, the trial court

did not abuse its discretion in determining that the probative value of the three autopsy photographs was not substantially outweighed by the danger of unfair prejudice.

The defendant cites to *State v. Harper*, 2015 WL 6736747 (Tenn. Crim. App. Nov. 3, 2015), in support of his assertion that the trial court erred in allowing the "gruesome" autopsy photographs into evidence. However, *Harper* is easily distinguishable because it presented a situation where the trial court admitted 44 autopsy photographs, the majority of which this Court described as "extremely graphic and gruesome." *Id.* at *13-*14. The admitted photographs showed a pregnant female with a "gaping wound" to the abdomen, "expelled bowel," and "intestines extruding through a wound," as well as photographs of a fetus with its liver and intestines exposed and its head severed from its body. *Id.* This Court determined that the photographs had minimal probative value as to "whether the [d]efendant was driving recklessly in such a manner that it created a substantial risk of death, whether he was intoxicated at the time of the incident, and whether he knew or reasonably should have known that death resulted from the accident," and that any probative value was substantially outweighed by the prejudicial nature of such "troubling [and] disturbing" photographs. *Id.* at *15-*16. The photographs at issue in this case are nowhere near as gruesome as those in *Harper*, and highly probative to the issues of intent and premeditation. The defendant is not entitled to relief.

## IV. Rehearing Witness Testimony

The defendant argues that the trial court erred in not allowing the jury to "rehear" the testimony of a State's witness, Kentarius Nealy, during deliberations upon its request. The State responds that the defendant waived this claim for failing to raise it in his motion for new trial, and alternatively, that the claim is without merit. We agree with the State.

The record shows that the jury began its deliberations at 12:25 p.m. on Thursday, March 23, 2023. Two hours later, the jury sent a question to the court asking, "Are we able to review the transcripts of witness Nealy?" After hearing extensive argument from the parties, the court replied to the jury: "The recorded testimony of witness Nealy from the trial is not transcribed at this time." As part of the discussion, the court commented to the attorneys that it would bring the jury into the courtroom to listen to the audio recording of the testimony if the jury requested that, but it would not suggest to the jury what it should request.

On Monday, March 27, 2023, the jury submitted another question to the court asking, "Are we able to review the transcripts of witness Nealy? Have they been transcribed?" After again hearing arguments from the parties, the court replied to the jury: "The recorded testimony of witness Nealy will not be transcribed for your use in deliberations. The recorded testimony may be played in open court if you desire to hear

- 15 -

it." At 12:37 p.m., the court brought the jury into the courtroom and played the audio recording of Mr. Nealy's testimony. The jury left the courtroom to continue with deliberations at 1:19 p.m.

Initially, the defendant has waived this issue for failing to raise it in his motion for new trial, amended motion for new trial, or at the motion for new trial hearing. *See* Tenn. R. App. P. 3(e) ("Provided, however, that in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."). Moreover, waiver notwithstanding, the claim is without merit. As recounted above, although the trial court initially denied the jury's request to review a transcript[4] of Mr. Nealy's testimony, it allowed the jury to listen to the audio recording of the testimony upon the jury's second request. Therefore, contrary to the defendant's assertion, the jury was "permitted to reexamine the witness's testimony[.]" The defendant is not entitled to relief.

## V. Juror Communication – Mistrial

The defendant argues that the trial court erred in declining to declare a mistrial after a juror was approached by someone inquiring if the jury had reached a verdict and that the court improperly inquired into the jury's deliberations. The State responds that the trial court's investigation was appropriate and it properly denied the motion for mistrial because all jurors indicated they could still be fair and impartial. We agree with the State.

The record reflects that after the trial court's final instructions, the jury began deliberating at 12:25 p.m. on Thursday, March 23, 2023, and were sent home for the evening at 6:28 p.m. The jury continued its deliberations at 9:02 a.m. the next morning. During a recess for lunch, the jury sent the court a question asking: "How are we to handle concerns of security? A juror was approached by an alleged cousin of the defendant inquiring/asking about the verdict in the case. This was a member of court custodial staff. The juror did not answer any questions." After discussing the situation with the attorneys, the court decided to individually question each of the jurors, beginning with the foreperson who had written the note, to gain more insight.

According to Juror #7, the foreperson, Juror #12 mentioned that the previous night when they were leaving for the day, she had sat down on the first floor to go through her purse when she was approached by a member of the custodial staff "asking if we had reached a not guilty verdict and that it was – because it was her cousin." Juror #12

---

[4] We note that the jury was specifically instructed at the beginning of trial that transcripts of the testimony would not be provided.

- 16 -

mentioned the encounter to a few jurors before deliberations that morning and then the entire group discussed it before the lunch break. Because Juror #7 believed that the encounter created security concerns, he felt the court should be notified.

Juror #12 was then called to recount the encounter. She explained that as they were leaving for the day, she stopped at a bench on the first floor of the courthouse and was approached by an African American female custodian. The woman said, "Did you find him not guilty? That's my cousin up there." Juror #12 responded, "I can't answer that," shook her head, stood up, and walked away. Juror #12 said that she was uncertain that the woman was "talking about this trial" because the woman did not identify the defendant or trial, or "seem to already know that . . . we hadn't reached a verdict at that point." Juror #12 said that there were two other jurors standing outside the building when she walked out, and she mentioned the incident to them. She also mentioned the incident "in the presence of the foreman and a couple of other jurors" when they came in that morning. Then, right before lunch, the foreman encouraged Juror #12 to share the incident with the entire group, which led to the sending of the note. Juror #12 elaborated:

> I don't feel like this was intimidation and I don't feel like it was an intentional attempt to gain information that the public would not have been privy to. I think they assumed the trial was over because we were leaving. That is my personal opinion. And I, again, don't know for certain that they are connected to this defendant. They did not identify anyone. So I don't feel unsafe, but I do know that it is concerning.

The court continued its questioning of the remaining jurors, specifically asking each one if he or she could be fair and impartial, and each affirmed he or she could. The court also asked each juror if he or she had any safety concerns surrounding the incident and, in response to that direct questioning, a handful indicated they would request an escort to their cars or had experienced a sense of unease around others in the hallway or parking garage. However, all jurors ultimately stated they did not feel threatened.

Defense counsel acknowledged that the interaction might not have been with a member of the defendant's family or related to the defendant's case but asserted that the jury's "belief that this family member would attempt to interfere . . . does prejudice [the defendant] severely[.]" As such, defense counsel moved for a mistrial.

In ruling on the motion, the court noted that under relevant caselaw, "Not every extrajudicial communication between a juror and a third party requires the Court to disqualify the juror, declare a mistrial, or grant a new trial. These remedies are required only when the extrajudicial communication is prejudicial to the defendant and is not harmless error." The court reviewed the comment and whether it caused jurors to feel

threatened or "have concerns about their security such that they would be influenced by something other than the law and the evidence in the case." The court found that the comment, in and of itself, was not a threatening or prejudicial statement, and the jurors said they were not threatened. The court denied the motion for mistrial. The court then brought the jury back into the courtroom and reminded them that the verdict must be rendered "with absolute fairness and impartiality," based only on the law and evidence.

The decision of whether to grant a mistrial is within the sound discretion of the trial court. *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). Normally, a mistrial should be declared only in the event that a manifest necessity requires such action. *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). "In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did." *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. *Id.* This Court will not disturb the trial court's decision unless there is an abuse of discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990).

Every criminal defendant enjoys the right to a trial "by an impartial jury." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. "Jurors must render their verdict based only upon the evidence introduced at trial, weighing the evidence in light of their own experience and knowledge." *State v. Adams*, 405 S.W.3d 641, 650 (Tenn. 2013) (citing *Caldararo ex rel. Caldararo v. Vanderbilt Univ.*, 794 S.W.2d 738, 743 (Tenn. Ct. App. 1990)). The validity of a jury verdict will be considered questionable "[w]hen a jury has been subjected to either extraneous prejudicial information or an improper outside influence." *Id.* (citing *State v. Blackwell*, 664 S.W.2d 686, 688 (Tenn. 1984)). Extraneous prejudicial information includes "information in the form of either fact or opinion that was not admitted into evidence but nevertheless bears on a fact at issue in the case." *Id.* (citations omitted). Improper outside influence is "any unauthorized private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury." *Id.* at 650-51 (quoting *Remmer v. United States*, 347 U.S. 227, 229 (1954)).

The defendant asserts that the trial court's questioning of each juror was improper because in doing so the court "[e]ffectively ask[ed] each juror about their deliberations in the case," which is not allowed under Tennessee Rule of Evidence 606(b). However, Rule 606(b) does not come into play until *after* a verdict has been reached. *See* Tenn. R. Evid. 606, Advisory Comm'n Cmts. Rather, we are guided by *State v. Smith*, 418 S.W.3d 38 (Tenn. 2013), for the appropriate protocol when a trial court learns *during* a jury's deliberations that an extra-judicial communication between a juror and a third-party has occurred.

- 18 -

"When a trial court learns that an extra-judicial communication between a juror and a third-party has occurred, the court must take steps to assure that the juror has not been exposed to extraneous information or has not been improperly influenced." *Id.* at 46. The trial court should conduct a hearing in open court "to place the facts in the record and to determine . . . whether cause exists to find that the juror should be disqualified." *Id.* The trial court should question the juror regarding "(1) the subject matter of the contact, (2) to whom the contact was directed, (3) the medium of the exchange, (4) whether any responses were received, and (5) the content of the communications." *Id.* at 49 (citation omitted). The trial court has the "power and authority to launch a full scale investigation," which includes questioning the members of the jury. *Id.* at 46 (quoting *Shew v. Bailey*, 260 S.W.2d 362, 368 (Tenn. Crim. App. 1951).

"Because of the potentially prejudicial effect of a juror's receipt of extraneous information, the State bears the burden . . . to explain the conduct of the juror or the third party or to demonstrate how the conduct was harmless." *Id.* Error is deemed harmless when "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* (quoting *State v. Brown*, 311 S.W.3d 422, 434 (Tenn. 2010)).

However, when the jury is not sequestered, there must be "something more than a showing of an extra-judicial communication between a juror and a third party . . . to shift the burden to the State." *Id.* "There must also be evidence that, as a result of the extra-judicial communication, some extraneous prejudicial fact or opinion was imported to one or more jurors or some outside improper influence was brought to bear on one or more jurors." *Id.* (internal quotation omitted). "Not every extra-judicial communication between a juror and a third-party requires the court to disqualify the juror, declare a mistrial, or grant a new trial. These remedies are required only when the extra-judicial communication is prejudicial to the defendant and is not harmless error." *Id.* at 49.

In this case, the comment itself was not prejudicial or improper on its face. It was simply an inquiry into whether there had been a verdict, and it is not even clear that the questioner was referring to this defendant or this trial. The questioner did not mention the defendant by name, and the courtroom is on the second floor and the interaction occurred on the first floor so the questioner could have been referring to any trial underway at that time. The record shows that the trial court laboriously questioned each of the jurors regarding his or her knowledge of the incident, concerns of safety due to the incident, and ability to render a fair and impartial verdict. Although all the jurors were aware of the encounter in varying degrees, all the jurors ultimately stated they did not feel threatened by the incident and maintained that they could render a fair and impartial verdict. In addition, the trial court reminded the jury that the verdict must be rendered "with absolute fairness and impartiality," based only on the law and evidence. Jurors are presumed to follow the instructions of the trial court. *State v. Inlow*, 52 S.W.3d 101, 106 (Tenn. Crim.

App. 2000). The fact the jury deliberated for another full day before returning a verdict indicates it followed the court's instructions. The defendant has shown no manifest necessity for a mistrial and is not entitled to relief.

## VI. Cumulative Error

The defendant argues that he is entitled to relief based on the cumulative errors committed at trial. The State responds that the defendant is not entitled to relief under the cumulative error doctrine because he failed to show any errors. We agree with the State.

The cumulative error doctrine applies when multiple errors were committed during trial, each of which alone would have constituted harmless error, but in the aggregate have a cumulative effect on the proceedings so great the defendant's right to a fair trial can only be preserved through reversal. *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). Circumstances warranting reversal of a conviction under the cumulative error doctrine "remain rare." *Id.* "To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings." *Id.* at 77. Because the defendant has not established any error, he is not entitled to relief under the cumulative error doctrine.

### *Conclusion*

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

s/ J. ROSS DYER
J. ROSS DYER, JUDGE

- 20 -